IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-01553-REB-KLM

THE PHOENIX INSURANCE COMPANY, a Connecticut insurance company, and
ST. PAUL SURPLUS LINES INSURANCE COMPANY, a Minnesota insurance company,

     Plaintiffs,

v.

TRINITY UNIVERSAL INSURANCE COMPANY OF KANSAS, a Kansas insurance company,
TRINITY UNIVERSAL INSURANCE OF KANSAS, a Kansas insurance company,
TRINITY UNIVERSAL INSURANCE COMPANY, a Texas insurance company, and
MOUNTAIN STATES MUTUAL CASUALTY COMPANY, a New Mexico insurance company,

     Defendants.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on **Plaintiffs' Motion for Partial Summary Judgment Against Defendant Mountain States Mutual Casualty Company Re: Liability** [Docket No. 69; Filed March 13, 2013] (the "Plaintiffs' Motion") and **Defendant Mountain States Mutual Casualty Company's Motion for Summary Judgment Pursuant to F.R.C.P. 56** [Docket No. 84; Filed April 16, 2013] (the "MS Motion," and, collectively with Plaintiffs' Motion, the "Motions"). On April 16, 2013, Defendant Mountain States Mutual Casualty Company ("MS") filed a Response to Plaintiffs' Motion [#83]. On May 10, 2013, Plaintiffs filed a Response to the MS Motion [#101]. On May 7, 2013, Plaintiffs filed a Reply in further support of Plaintiffs' Motion [#99]. On May 24, 2013,

Defendant MS filed a Reply in further support of the MS Motion [#102].   Pursuant to 28 U.S.C. § 636 (b)(1)(A) and D.C.COLO.LCivR 72.1C., the Motions have been referred to this Court for a recommendation regarding disposition.  The Court has reviewed the Motions, the Responses, the Replies, the entire case file, and the applicable law, and is sufficiently advised in the premises.   For the reasons set forth below, the Court respectfully **RECOMMENDS** that Plaintiffs' Motion [#69] be **GRANTED in part** and that the MS Motion [#84] be **DENIED**.

## I.  Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

## II.  Summary of the Case

### A.    Factual Background

This case is brought by a general contractor's insurer against the insurers of various subcontractors seeking contribution for the defense costs associated with a lawsuit brought against the general contractor.  In the Motions, Plaintiffs and Defendant MS each argue about whether the work performed by the subcontractor insured by Defendant MS was implicated in the underlying litigation and, therefore, whether Defendant MS had a duty to defend the general contractor as an additional insured.

More specifically, Okland Construction Company, Inc. ("Okland") served as the general contractor for the construction of the Rivergate Loft Condominiums (the "Project"). *Plaintiffs' Motion* [#69] at 2; *MS Response* [#83] at 4; *Amended D'Agostino Decl.*, Ex. B [#70-2] (Contract Assignment Agreement).  Plaintiffs Phoenix Insurance Company and St. Paul Surplus Lines Insurance Company (collectively, "Travelers" or "Plaintiffs") insured

Okland as the general contractor for the Project (the "Travelers Policy"). *Plaintiffs' Motion* [#69] at 3; *MS Response* [#83] at 4. The Travelers Policy provides that any other insurance under which Okland was added as an additional insured by attachment of an endorsement is primary to the Travelers Policy. *Plaintiffs' Motion* [#69] at 3 (citing *Decl. of Nick D'Agostino Ex. C* [#70-3] at 4, *Ex. F* [#70-6] (Travelers Policy) at 11). Specifically, the Travelers Policy states:

### 4.      Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

**a.      Primary Insurance**
This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b.      Excess Insurance**
This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:
. . .

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. . . .

*Travelers Policy* [#70-6] at 31.

In constructing the Project, Okland contracted with several subcontractors, including San Juan Insulation and Drywall, Inc. ("San Juan").  *See generally San Juan Subcontract Agreement* [#70-4].  Pursuant to the San Juan Subcontract Agreement, San Juan was to complete the following work at the Project:

A.    Insulation:
1.    Provide exterior wall insulation;
2.    Provide acoustical insulation at all demising floors and interior unit demising walls;
3.    Acoustical insulation at all interior unit walls;
4.    Provide batt insulation in the ceilings at all roofing locations; and
5.    Provide vapor barrier on all exterior insulation on the warm side of the building;
B.    Acoustical Ceiling Tiles;
C.    Metal Ceilings; and
D.    Tenting of Electrical Fixtures.

*Affidavit of Jeff A. Jaeger* ("Jaeger Aff.") [#83-2] at 2; *see also San Juan Subcontract Agreement* [#70-4] at 4.

The San Juan Subcontract Agreement requires San Juan "to carry comprehensive liability property damage Insurance . . . and name [Okland] as an additional Insured on all insurance certificates . . . in order to protect [Okland] and [San Juan] against loss resulting from any acts of [San Juan], [its] agents, and/or employees."  *San Juan Subcontract Agreement* [#70-4] at 8.  The San Juan Subcontract Agreement also lists types of insurance and the associated forms which San Juan is required to obtain and execute.  *Id.* This includes: "Commercial General Liability Insurance . . . with . . . Endorsements attached thereto including the following or their equivalent . . . ISO Form CG 20 10 (11/85), Additional Insured - Owners, Lessees, Or Contractors (Form B), <u>naming the General Contractor and Owner as additional Insured</u> and containing the following statement - 'This

4

Endorsement Also Constitutes Primary Coverage and not contributing In The Event Of Any Occurrence, Claim, Or Suit'." *Id.* (emphasis and capitalization in original).  The San Juan Subcontract Agreement further states: "All insurance required hereunder shall be maintained in full force and effect in a company or companies satisfactory to [Okland], [and] shall be maintained at [San Juan's] expense until performance in full hereof . . ." *Id.*

San Juan was insured by Defendant MS (the "MS Policy").  *See generally Aff. of Stacey E. Scherer* [#83-1]; *MS Policy* [#83-1].  The MS Policy provides coverage for "insureds."  Under the MS Policy, "insureds" includes both San Juan as the "Named Insured" and additional insureds, which includes:

> Any person or organization to whom or to which you[1] are obligated by virtue of a written contract, agreement or permit to provide such insurance as afforded by this policy is an insured, but only with respect to liability resulting from:
>
> a.      "Your work"[2] for that insured by you . . .

*MS Policy* [#83-1] at 49.  The MS Policy further provides that "[a]ny coverage provided by the [MS Policy] to an additional insured shall be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis unless a written contract, agreement or permit specifically requires that this insurance apply on a primary or contributory basis." *MS Policy* [#83-1] at 11 (endorsement titled: Additional Insureds Exception to Excess Coverage which "modifies insurance provided under the" MS Policy).  The MS Policy provides insurance which covers "sums

---

[1]  "You" refers to the Named Insured, San Juan.  *MS Policy* [#83-1] at 40.

[2]  "Your work" is defined as: "(1) [w]ork or operations performed by you or on your behalf; and (2) [m]aterials, parts or equipment furnished in connection with such work or operations." *MS Policy* [#83-1] at 55.

that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage'[3] to which this insurance applies."   *MS Policy* [#83-1] at 40.   The MS Policy goes on: "This insurance applies to 'bodily injury' and 'property damage' only if . . . the 'property damage' is caused by an 'occurrence'[4] . . ."   *Id.*

On January 13, 2010, Rivergate Loft Condominium Owners Association ("RLCOA") filed a lawsuit against Okland and others (the "Underlying Action"), alleging construction defects and property damage in connection with the Project.   *See generally Underlying Complaint* [#70-5].   In the Underlying Complaint, RLCOA included a variety of allegations and a list of specific alleged defects including:

> 46. Without limitation, various elements of the [Property] suffer from the following construction defects or deficiencies, among others, which have caused, and will continue to cause, resultant and consequential property and other damages:
>
> . . .
>
> R.    Sounds
>
> > 1.    Wall-to-wall sound transmission complaint.
> >
> > > a.  Potential design STC[5] issue.
>
>  . . .
>
> 47. Upon information and belief, these and other errors, deficiencies and defects, for which the Defendants are legally liable, have caused and

---

[3] "Property damage" is defined as: "(a.) [p]hysical injury to tangible property, including all resulting loss of use of that property. . . . or (b.) [l]oss of use of tangible property that is not physically injured. . . ."  *MS Policy* [#83-1] at 54.

[4] "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  *MS Policy* [#83-1] at 54.

[5] Defendant MS claims that "STC" is an abbreviation for "sound transmission class." *Response to Plaintiffs' Motion* [#83] at 11 n.4.

continue to cause [plaintiff] actual property damage and/or other losses, and consequential damage to, and the loss of use of, various elements of the Project . . .

*Underlying Complaint* [#70-5] at 12-13.

On February 25, 2010, Okland notified San Juan of the Underlying Action, which was filed on January 13, 2010, alerting San Juan that the Underlying Complaint included allegations relating to "defects with acoustical performance of the demising walls among other defects related to San Juan's work." *Notice of Claim Letter* [#70-8] at 4.  The Notice of Claim Letter further stated that San Juan should forward the letter to its insurance carrier and that the letter constituted "a notice of claim pursuant to C.R.S. § 13-20-803.5 and a formal tender of this matter for your participation in defending and resolving these claims." *Id.* at 5.  On April 6, 2011, Okland's counsel tendered a demand "that Mountain States Mutual Insurance Casualty Company provide and contribute to the defense of the above captioned matter on behalf of Okland." *Letter to MS* [#70-9] at 2.   Plaintiffs claim that neither they nor Okland received a response from Defendant MS regarding the tenders. *Plaintiffs' Motion* [#69] at 4; *Amended D'Agostino Decl.* [#74-1] at ¶ 5.  Plaintiffs contend that they "incurred approximately $2,288,018.30 in defense of Okland in the [U]nderlying [A]ction." *Plaintiffs' Motion* [#69] at 4; *Amended D'Agostino Decl.* [#74-1] at ¶ 6.

Plaintiffs allege that "prior to the start of trial in the Underlying Action," they settled with the RLCOA.  *Amended Complaint* [#11] at ¶ 27.  Plaintiffs further claim that "[t]he settlements of the Underlying Action settled Okland's indemnity claims, but none of the settlements satisfied the defense obligation of any of the" subcontractors' insurers.  *Id.*

On June 15, 2011, Plaintiffs commenced the present action, seeking to recover amounts that they allege various subcontractors' insurers were obligated to contribute

toward Okland's defense.  *See generally Compl.* [#1].  On July 31, 2011, Plaintiffs filed an

Amended Complaint [#11], stating three claims for relief against all Defendants.  First,

pursuant to their right of equitable subrogation, Plaintiffs assert a claim for reimbursement

of fees and costs incurred in defending Okland in the Underlying Action.  *See Amended

Complaint* [#11] at 7-8.  Second, pursuant to their rights of contribution and equitable

contribution, Plaintiffs assert a claim to recover various subcontractors' insurers'

proportionate shares of fees and costs incurred in defending Okland in the Underlying

Action.  *Id.* at 8-9.  Third, Plaintiffs assert a claim for declaratory relief stating that the

subcontractors' insurance policies provided for Okland's defense on a primary basis and

the Travelers Policy provided for Okland's defense on an excess basis.  *Id.* at 9-10.

### B.    Plaintiffs' Motion[6]

In Plaintiffs' Motion, Plaintiffs argue that Defendant MS had a duty to defend Okland

in the Underlying Action as an additional insured under the MS Policy.  *Id.* at 5.  Plaintiffs

further argue that Defendant MS's obligation to defend Okland in the Underlying Action was

primary over Plaintiffs' Policy.  *Id.* at 6.  Plaintiffs premise this argument on the language

of the San Juan Subcontract Agreement [#70-4], which Plaintiffs claim contains a

requirement that San Juan's insurance, to which Okland was added as an additional

insured, was primary insurance.  *Plaintiffs Motion* [#69] at 6.  As a result, Plaintiffs argue

that they are entitled to reimbursement of the defense costs spent in the defense of Okland

in the Underlying Action.  *Id.* at 7.    The Court notes that ultimately if Defendant MS is

found to have beached a duty to defend Okland, the MS Policy is found to be primary, and

---

[6]  The Court summarizes only those arguments which merit analysis.

the Travelers Policy is found to be excess, Defendant MS may be required to reimburse Plaintiffs for the full amount of defense costs and fees sought by Plaintiffs up to Defendant MS's policy limits.  *See D.R. Horton, Inc.-Denver v. Travelers Indem. Co. of Am.*, 2012 WL 5363370, at *8-9 (D. Colo. Oct. 31, 2012) ("*D.R. Horton I*").  Because Plaintiffs' Motion purports to "*only* seek a determination regarding [Defendant MS's] liability to [Plaintiffs] for failing to provide Okland with a defense," *Plaintiffs' Motion* [#69] at 2 (emphasis added), this Recommendation addresses the liability issue only and does not reach the question of actual damages.

In its Response, Defendant MS argues that it had no duty to defend Okland because the allegations in the Underlying Complaint did not relate to defects in San Juan's work, therefore, the policy was not implicated by the Underlying Action.  *Response to Plaintiffs' Motion* [#83] at 11.  Regarding the allegation in the Underlying Action relating to "wall-to-wall sound transmission," Defendant MS argues that "San Juan's work did not involve design or, more specifically, design as to sound transmission." *Id.* at 11.  Defendant MS further argues that because the MS Policy only provides coverage related to liability arising "out of the work done by the original named insured," *id.* at 12 (quoting *Plaintiff's Motion* [#69] at 5-6), and the Underlying Complaint does not include any allegations relating to San Juan's work, Defendant MS did not have a duty to defend Okland in the Underlying Action. *Id.*  Defendant MS also argues that the defects alleged in the Underlying Complaint are not covered by the MS Policy because they do not arise from an "occurrence." *Id.* at 13.  This argument is based on case law which is discussed below.  Finally, Defendant MS argues that it did not have a duty to defend Okland because the allegation regarding "wall-to-wall sound transmission" in the Underlying Complaint was not covered "property damage" under

the MS Policy.  *Id.* at 15.

In their Reply, Plaintiffs argue that the "Underlying Complaint specifically alleges that subcontractors are among the parties responsible for the Project's construction defects," and that the "Underlying Complaint alleges that the defects caused property damage." *Plaintiffs' Reply* [#99] at 2.  Plaintiffs argue that the scope of San Juan's work is irrelevant to determining whether Defendant MS had a duty to defend Okland in the Underlying Action because Defendant MS's "duty to defend is determined by analyzing whether the Underlying Complaint alleged 'property damage.'" *Id.* at 5.  Plaintiffs further claim that "the Underlying Complaint alleged 'property damage' resulting from an 'occurrence,'" *id.* at 6, and that Defendant MS "was obligated to defend any claim in which the allegations stated a claim which was potentially or arguably within the policy coverage." *Id.* at 8.  In addition, Plaintiffs contend that Defendant MS did not address certain arguments raised in Plaintiffs' Motion [#69] and that Defendant MS has therefore conceded the following issues:

> 1. That Okland was an [additional insured] under the MS Policy;
> 2. The MS Policy provided primary coverage to Okland as an [additional insured];
> 3. [Plaintiffs' Policy] was excess over the MS Policy with respect to coverage for Okland in the Underlying Action; and
> 4. If [Defendant MS] has a duty to defend Okland, then [Defendant MS] owes [Plaintiffs] full reimbursement of all costs [Plaintiffs] incurred in Okland's defense.

*Plaintiffs' Reply* [#99] at 4.

## C.     The MS Motion

In the MS Motion, Defendant MS revisits the arguments made in its Response to Plaintiffs' Motion.  Defendant MS argues that it had no duty to defend Okland because the allegations in the Underlying Complaint did not relate to defects in San Juan's work, therefore, the MS Policy was not implicated by the Underlying Action.  *MS Motion* [#84] at

11. Defendant MS further argues that "San Juan's work did not involve design or, more specifically, design as to sound transmission." *Id.* at 11. Defendant MS further argues that because the MS Policy only provides coverage related to liability arising "out of the work done by the original named insured," *id.* at 12 (quoting *Plaintiff's Motion* [#69] at 5-6), and the Underlying Complaint does not include any allegations relating to San Juan's work, Defendant MS did not have a duty to defend Okland in the Underlying Action. *Id.* Defendant MS also argues that the defects alleged in the Underlying Complaint are not covered by the MS Policy because they do not arise from an "occurrence." *Id.* at 13. Finally, Defendant MS argues that it did not have a duty to defend Okland because the allegation regarding "wall-to-wall sound transmission" in the Underlying Complaint was not covered "property damage" under the MS Policy. *Id.* at 15.

In their Response, Plaintiffs largely revisit the arguments made in their Reply in further support of Plaintiffs' Motion [#99]. Specifically, Plaintiffs argue that the "Underlying Complaint expressly alleges that the subcontractors were responsible for the defectively designed and 'constructed elements' as described in the Underlying Complaint." *Response to MS Motion* [#101] at 6. Plaintiffs further argue that the scope of San Juan's work is irrelevant to determining whether Defendant MS had a duty to defend Okland in the Underlying Action because Defendant MS's "duty to defend Okland must be determined by analyzing only whether the Underlying Complaint alleged 'property damage' that may have resulted from San Juan's 'work' on the Project." *Id.* at 7. Plaintiffs further claim that "the Underlying Complaint contains specific allegations of 'Property Damage' resulting at the Project, including damage to potential third-party property. *Id.* at 10. Plaintiffs aver that such allegations are "sufficient to allege the potential for 'property damage,'" and that, as

11

a result, Defendant MS "had a duty to defend Okland in the Underlying Action." *Id.* Plaintiffs further claim that "the Underlying Complaint alleged 'property damage' resulting from an 'occurrence.'" *Id.*   Plaintiffs also present arguments regarding the allegations necessary to trigger Defendant MS's duty to defend and its duty to indemnify. *Id.* at 10-13. Then, Plaintiffs revisit the specific allegations in the Underlying Complaint and argue that certain allegations implicate San Juan's work and, therefore, trigger the MS Policy. *Id.* at 15-17.

In its Reply, Defendant MS challenges Plaintiffs' argument that Defendant MS's duty to defend should be determined solely by examining the MS Policy and the Underlying Complaint. *Defendant MS's Reply* [#102] at 3.   Defendant MS also offers a policy argument claiming that if sweeping allegations that do not name a specific insured are included in a complaint and are found to trigger an insurer's duty to defend, every subcontractor's insurers would have to defend all construction defect cases. *Id.* at 4.   In addition, Defendant MS argues that "[i]t is the fact that San Juan is both not named and its work is not identified as defective in the Underlying Complaint that compels the conclusion that there is no duty to defend." *Id.* at 5.   Regarding the Underlying Complaint's allegation regarding the transmission of sound, Defendant MS argues that "the Underlying Complaint makes no allegation that sound transmission caused any consequential property damages," and even if it did, San Juan, an "insulation installer," had "nothing to do with" sound transmission issues. *Id.*

### III.  Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Pursuant to Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable jury could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 277 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonvovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable jury could find in his favor. *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence, which the Court views in the light most favorable to him. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869,

13

875 (10th Cir. 2004).   The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright, et al., *Federal Practice and Procedure* § 2738 at 356 (3d ed.1998).

## IV.  Analysis

### A.    Duty to Defend

Here, Plaintiffs and Defendant MS both seek summary judgment on the issue of Defendant MS's duty to defend.  Further, the parties agree on the underlying material facts. Therefore, the Court jointly considers the Motions.  See *Greystone Const., Inc. v. National Fire & Marine Ins Co.*, 2013 WL 1324600 (D. Colo. March 31, 2013) ("*Greystone I*") (jointly resolving two motions for summary judgment regarding an insurer's duty to defend).

### 1.    Applicable Principles of Colorado Insurance Law

The parties agree that Colorado law applies.  "Under Colorado law, an insurance policy is construed according to principles of contract interpretation." *Greystone I*, 2013 WL 1324600, at *3 (citing *Thompson v. Md. Cas. Co.,* 84 P.3d 496, 502 (Colo. 2004)).  "The policy's language must be given the plain meaning of the words used, unless there is an indication by the parties of a mutual intent that an idiosyncratic meaning would apply." *Id.* Further, the Court must view the policy as a whole, "giving effect to all provisions." *Id.*  In addition, in a dispute regarding an insurance policy, "[b]ecause of the 'unique nature of insurance contracts and the relationship between the insurer and insured,' ambiguous provisions are construed against the insurer and in favor of providing coverage to the insured." *Id.* (quoting *Cyrus Amax Minerals Co. v. Lexington Ins. Co.,* 74 P.3d 294, 299

14

(Colo. 2003)).  Coverage exclusions are also construed against the insurer.  *See Worsham Constr. Co. v. Reliance Ins. Co.,* 687 P.2d 988, 990 (Colo. App. 1984).  "To benefit from an exclusionary provision in a particular contract of insurance, the insurer must establish that the exemption claimed applies in the particular case and that the exclusions are not subject to any other reasonable interpretations." *Am. Family Mut. Ins. Co. v. Johnson,* 816 P.2d 952, 953 (Colo. 1991).

"In Colorado, the duty of an insurer to defend its insured is distinct from its duty to indemnify the insured."  *Greystone I*, 2013 WL 1324600, at *3 (citing *Compass Ins. Co. v. City of Littleton,* 984 P.2d 606, 613-14 (Colo. 1999)).  The duty to defend is the "insurance company's duty to affirmatively defend its insured against pending claims."  *Constitution Assoc. v. N.H. Ins. Co.,* 930 P.2d 556, 563 (Colo. 1996).  "When an insurer refuses to defend in an underlying suit, and the insured[7] brings an action for defense costs, the duty to defend is determined by application of the complaint rule."  *Greystone I*, 2013 WL 1324600, at *3 (citing *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.,* 90 P.3d 814, 828 (Colo.2004)).  The complaint rule limits the Court to "examination of solely the policy and the complaint."  *Pompa v. Am. Fam. Mut. Ins. Co.*, 520 F.3d 1139, 1145 (D. Colo. 2008). Under the complaint rule, "a duty to defend arises when the underlying complaint alleges any facts that might fall within the coverage of the policy."  *Greystone I*, 2013 WL 1324600, at *3 (citing *Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083, 1089 (Colo. 1991)).  "Where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably

---

[7]  Under the MS Policy, "insureds" included both San Juan as the "Named Insured" and Okland as an additional insured.  *MS Policy* [#83-1] at 49.

within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage has been pleaded, the insurer must accept the defense of the claim." *Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.,* 661 F.3d 1272, 1284 (10th Cir. 2011) ("*Greystone II*") (quoting *Compass Ins. Co.,* 984 P.2d at 613–14). When applying the complaint rule, "[t]he insured's actual liability is not considered. Instead, the duty to defend arises where the allegations in the complaint, if sustained, would impose a liability covered by the policy." *Greystone I*, 2013 WL 1324600, at *3.

When analyzing the underlying complaint, the court should be mindful that "[t]he insured need only show that the claim alleged in the underlying complaint *could* fall within policy coverage; the insurer must prove that it *could not." Greystone I*, 2013 WL 1324600, at *4 (citing *Compass Ins. Co.,* 984 P.2d at 614). "An insurer seeking to avoid its duty to defend an insured bears a heavy burden. It is not excused from its duty unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured." *Id.* (citing *Hecla,* 811 P.2d at 1089-90). "Furthermore, coverage provisions in an insurance contract are to be liberally construed in favor of the insured to provide the broadest possible coverage." *Fire Ins. Exchange v. Bentley*, 953 P.2d 1297, 1300 (Colo. App. 1998) (citation omitted).

### 2.  The Scope of the MS Policy

Here, Defendant MS contends that the Underlying Complaint does not allege any claim that would trigger its duty to defend pursuant to the MS Policy. The MS Policy provided coverage for "insureds." Under the MS Policy, "insureds" included both San Juan as the "Named Insured" and additional insureds which included:

Any person or organization to whom or to which you are obligated by virtue

16

of a written contract, agreement or permit to provide such insurance as afforded by this policy is an insured, but only with respect to liability resulting from:

a.     "Your work" for that insured by you . . .

*MS Policy* [#83-1] at 49.  The MS Policy provided insurance which covered "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  *MS Policy* [#83-1] at 40.  The MS Policy also made clear that "[Defendant MS] will have the right and duty to defend any 'suit' seeking those damages to which this insurance applies."  *Id.*[8]

The San Juan Subcontract Agreement required San Juan "to carry comprehensive liability property damage Insurance . . . and name [Okland] as an additional Insured on all insurance certificates . . . in order to protect [Okland] and [San Juan] against loss resulting from any acts of [San Juan], [its] agents, and/or employees."  *San Juan Subcontract Agreement* [#70-4] at 8.  As a result, Okland became an additional insured under the MS Policy.

A straight-forward reading of the MS Policy leads the Court to conclude that under the MS Policy, Defendant MS had a duty to defend Okland in the Underlying Action against any allegations relating to San Juan's work which allegedly resulted in property damage. Therefore, the San Juan Subcontract Agreement's terms limit the scope of Defendant MS's

---

[8] As noted above, "[a]n insurer is obligated to defend its insured against legal proceedings if the underlying complaint contains allegations that, if sustained, would state a claim that is potentially or arguably within the policy coverage."  *Bainbridge, Inc. v. Travelers Cas. Co. of Connecticut*, 159 P.3d 748, 753 (Colo. App. 2006).  "Generally, the appropriate course of action for an insurer who believes it has no duty to defend is to provide a defense to the insured under a reservation of rights to seek reimbursement, or to file a declaratory judgment action after the underlying case has been adjudicated."  *Id.* at 751 (citing *Hecla Mining*, 811 P.2d at 1089).

duty to defend Okland in the Underlying Action.  Pursuant to the San Juan Subcontract

Agreement,[9] San Juan was to complete the following work at the Project:

> A.     Insulation:
>> 1.     Provide exterior wall insulation;
>> 2.     Provide acoustical insulation at all demising floors and interior
>>        unit demising walls;
>> 3.     Acoustical insulation at all interior unit walls;
>> 4.     Provide batt insulation in the ceilings at all roofing locations;
>>        and
>> 5.     Provide vapor barrier on all exterior insulation on the warm side
>>        of the building;
> B.     Acoustical Ceiling Tiles;
> C.     Metal Ceilings; and
> D.     Tenting of Electrical Fixtures.

*Jaeger Aff.* [#83-2] at 2; *see also San Juan Subcontract Agreement* [#70-4] at 4.

Defendant MS argues that the MS Policy applies to 'property damage' only if . . . the

'property damage' is caused by an 'occurrence,'" *MS Policy* [#83-1] at 40, and "Okland's

pure faulty work" is not an occurrence pursuant to the MS Policy.  *MS Motion* [#84] at 13.

As noted above, "occurrence" is defined as "an accident, including continuous or repeated

exposure to substantially the same general harmful conditions."  *MS Policy* [#83-1] at 54.

The definition of the term "occurrence" as used in insurance policies has been the

subject of much litigation in Colorado.  In response to a similar lawsuit, C.R.S. § 13-20-808

was enacted.  *Colorado Pool Sys., Inc. v. Scottsdale Ins.* Co., --- P.3d ---, 2012 WL

5265981, at *3 (Colo. App. Oct. 25, 2012); *see also Greystone II*, 661 F.3d at 1279.

Section 13-20-808 establishes a statutory definition of "accident" under Colorado law:

> In interpreting a liability insurance policy issued to a construction

---

[9] Because the San Juan Subcontract Agreement is the instrument through which the MS Policy became applicable to Okland, it must be considered for the limited purpose of defining the limitations on coverage provided to Okland as an additional insured under the MS Policy.

professional, a court shall presume that the work of a construction professional that results in property damage, including damage to the work itself or other work, *is an accident unless the property damage is intended and expected by the insured.* Nothing in this subsection [ ]:

(a) Requires coverage for damage to an insured's own work unless otherwise provided in the insurance policy; or

(b) Creates insurance coverage that is not included in the insurance policy.

C.R.S. § 13-20-808(3) (emphasis added) (parenthetical omitted).  Section 13-20-808 also states: "If an insurance policy provision that appears to grant or restore coverage conflicts with an insurance policy provision that appears to exclude or limit coverage, the court shall construe the insurance policy to favor coverage if reasonably and objectively possible."*Id.* §13-20-808(5) (parenthetical omitted).

Here, the insurance policy, the incidents relating to the Project, and the Underlying Action all preceded enactment of the statute.  Both *Greystone II* and *Colorado Pool Systems* address the question of whether Section 13-20-808 applies retroactively.  In *Greystone II*, the Tenth Circuit held that Section 13-20-808 did not apply retroactively.  661 F.3d at 1280.  The court noted that the statute specifies that it "applies to all insurance policies currently in existence or issued on or after the effective date of this act."  *Id*.  The court found this language to mean that the statute applies to insurance policies for which the policy periods have not yet expired.  *Id.*  Here, the MS Policy in the Court record expired on April 1, 2005, [#83-1] at 3, and neither party makes any argument that the MS Policy was extended into 2010, the year the statute was enacted.[10]  Therefore, the statute is not applicable here and the Court must look to precedent to determine if defective

---

[10]  The MS Motion states that the last policy under which Defendant MS insured San Juan expired on April 1, 2007.  *MS Motion* [#84] at 3; *see also Scheduling Order* [#14] at § 3.b.iv.

workmanship constitutes an "occurrence" as defined in the MS Policy.

"As a general matter, '[f]aulty workmanship can constitute an occurrence that triggers coverage under a CGL policy if: (1) the property damage was not caused by purposeful neglect or knowingly poor workmanship, and (2) the damage was to nondefective[11] portions of the contractor's or subcontractor's work or to third-party property.'" *Hubbell v. Carney Bros. Const.*, No. 05-cv-00026-CMA-KLM, 2013 WL 2029037, at *5 (quoting *Mt. Hawley Ins. Co. v. Creek Side at Parker Homeowners Ass'n, Inc.*, No. 11-cv-02658-RBJ, 2013 WL 104795 (D. Colo. Jan. 8, 2013)); *see also Greystone II*, 661 F.3d at 1284 ("the CGL policies at issue may cover damage to nondefective property arising from poor workmanship."). Here, there are no allegations that the Property was defective. The *Greystone II* court held "that injuries flowing from improper or faulty workmanship constitute an occurrence so long as the resulting damage is to nondefective property, and is caused without expectation or foresight." *Id.* Here there are no allegations that the damage claimed in the Underlying Action was "caused by purposeful neglect or knowingly poor workmanship," *id.* at 1285-86, or was caused with expectation or foresight. *Id.* at 1284. Therefore, the Court finds that the allegations in the Underlying Complaint about defects at the Property relate to poor workmanship. As a result, the Court finds that damage to property "caused by a subcontractor's faulty workmanship, may be an 'accident' or 'occurrence'" under the MS Policy. *Id.* at 1287; *see also Mt. Hawley Ins. Co.*, 2013 WL 104795, at *2; *Colorado Pool Sys., Inc.*, 2012 WL 5265981, at *7 (applying the *Greystone II* test and finding some damage to be the result of an accident and, therefore, covered by

---

[11]   The Tenth Circuit explained that "nondefective property is property that has been damaged as a result of poor workmanship." *Greystone II*, 661 F.3d at 1284.

the insurance policy). Because the Court concludes that defective workmanship constitutes an "occurrence" under the MS Policy, if the allegations of property damage in the Underlying Complaint are alleged to result from San Juan's defective workmanship, the MS Policy is implicated.

### 3.    The Allegations in the Underlying Complaint

As noted above, the Underlying Complaint included, among other things, allegations relating to the transmission of sound and the moisture management system.  *See Underlying Complaint* [#70-5] at 12-13.  The Underlying Complaint also alleges that "these errors, deficiencies and defects, for which the Defendants are legally liable, have caused and continue to cause the [plaintiff] actual property damage and/or other losses, and consequential damage to, and the loss of use of, various elements of the Project . . ." *Id.* at 13.  There can be no question that the Underlying Complaint alleges property damage.[12] Therefore, the central dispute between the parties in the Motions is whether these allegations implicate the work performed by San Juan pursuant to the San Juan Subcontract Agreement.

First, it is clear that the Underlying Complaint alleges a sound defect.  *See Underlying Complaint* [#70-5] at 13 (alleging "wall-to-wall sound transmission" defect). Second, it is clear that San Juan performed "acoustical insulation" work on the Project. *See San Juan Subcontract Agreement* [#70-4] at 4.  However, it is unclear to the Court, which is limited to considering the MS Policy and the Underlying Complaint, if the subbullet

---

[12] Again, "property damage" is defined in the MS Policy as: "(a.) [p]hysical injury to tangible property, including all resulting loss of use of that property. . . . or (b.) [l]oss of use of tangible property that is not physically injured. . . ." *MS Policy* [#83-1] at 54.

in the Underlying Complaint which states "potential design STC issue" is merely *one possible explanation* for the sound defect or if "potential design STC issue" is offered as the *only reason* for the sound defect.   Defendant MS argues that the subbullet means that the sound issue is a design issue, not an insulation issue and, therefore, the sound issue has nothing to do with San Juan's work on the Project.   *See MS Motion* [#84] at 11.   The Court notes that all but two of the subbullets included in the list of defects in the Underlying Complaint do not include the word "potential" and appear to state the actual reasons for the various issues.   Here, the use of the word "potential" makes this subbullet subject to more than one interpretation.   Because the Underlying Complaint is ambiguous and "[t]he insured need only show that the claim alleged in the underlying complaint *could* fall within policy coverage," the Court concludes that the claim alleged could relate to San Juan's acoustical work, and Defendant MS therefore had a duty to defend Okland in the Underlying Action. *Greystone I*, 2013 WL 1324600, at *4 (citing *Compass Ins. Co.,* 984 P.2d at 614). Defendant MS's argument to the contrary does not meet the heavy burden of establishing that "there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured."   *Id.* (citing *Hecla,* 811 P.2d at 1089-90).

**B.    The MS Policy Provided Primary Coverage**

Plaintiffs argue that the MS Policy is primary over the Travelers Policy.   *Plaintiffs' Motion* [#69] at 6.   Defendant MS does not address this argument in its Response to Plaintiffs' Motion.   *See generally Response to Plaintiffs' Motion* [#83].   Therefore, in their Reply, Plaintiffs argue that Defendant MS has conceded that "the Travelers Policy was excess over the MS Policy with respect to coverage for Okland in the Underlying Action." *Plaintiffs' Reply* [#99] at 4.   A review of the MS Motion [#84] and Defendant MS's Reply in

further support of the MS Motion [#102] reveal that neither of those pleadings address the question of which policy is primary.[13]   Plaintiffs cite to *American Automobile Insurance Company v. Marlow*, in which the Court found that a failure to admit or deny facts contained in a statement of undisputed facts results in those facts being deemed admitted and that "the Court must enter summary judgment in [movant's] favor if it is appropriate under the facts and authorities before the Court."   666 F.Supp.2d 1209, 1213 (D. Colo. 2009).   However, the *Marlow* holding was based on Judge Brimmer's Practice Standards, which require that a response to a motion for summary judgment admit or deny the material facts set forth by the movant.   *See* PAB Civ. Practice Standard III.F.3.b.iv.   Neither the undersigned nor Judge Blackburn, the presiding judge, include such a requirement in their practice standards.   *See generally* KLM Practice Standards, REB Civ. Practice Standards.   Plaintiffs cite to no other authority in support of their proposition that Defendant MS's failure to address an issue raised by Plaintiffs should be deemed a concession that the MS Policy is primary over the Travelers Policy.   Therefore, although the Court will not consider arguments made by Defendant MS in pleadings unrelated to the Motions, the Court will not

---

[13]   The Court notes that Defendant MS addresses this issue in a pleading [#138] filed in response to a pending motion [#126] which is not addressed herein.  However, the Court will not consider additional pleadings that do not relate to the two Motions addressed in this Recommendation.  If a party wishes to address an issue raised in a motion, it should do so in a responsive pleading and cannot rely on the Court to provide argument on that party's behalf.  In this case, Defendant MS failed to address this issue which was raised by Plaintiffs in two pleadings: (1) Plaintiffs' Motion (both within the material undisputed facts section and as a separate legal argument within the pleading), *see Plaintiffs' Motion* [#69] at 3-4, 6-7; and (2) Plaintiffs' Reply wherein Plaintiffs argue that Defendant MS's failure to address the issue means Defendant MS concedes the issue, *see Plaintiffs' Reply* [#99] at 4.  Therefore, Defendant MS was aware of Plaintiffs' argument that the MS Policy provides primary coverage more than a month prior to filing any of its pleadings considered herein.  As a result, the Court will not read into Defendant MS's pleadings relating to the Motions an argument raised in briefing filed in response to a separate motion.

assume that Defendant MS has conceded this issue.

"Under Colorado law, the Court interprets an insurance policy as it would any other contract." *Certain Underwriters at Lloyd's, London v. Am. Fam. Mut. Ins. Co.*, No. 06-cv-01767-MSK-MJW, 2007 WL 2694854, at *3 (D. Colo. Sept. 10, 2007) (citing *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003)). The Court must give effect to the intent and reasonable expectations of the parties to the contract, the insurer and the insured. *See Thompson v. Maryland Cas. Co.,* 84 P.3d 496, 501 (Colo. 2004). In doing so, "the Court first determines whether the contract is ambiguous, *i.e.*, susceptible to more than one meaning." *Lloyd's*, 2007 WL 2694854, at *3 (citing *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1359 (Colo. 1993)). If the Court finds that the policy is ambiguous, "then the Court must determine what the parties to the contract intended. Whenever possible, such intent is discerned from the policy itself." *Id.* (citing *Bengtson v. USAA Property & Cas. Ins.*, 3 P.3d 1233, 1235 (Colo. App. 2000)). As part of its analysis of what the parties to the contract intended, the Court may consider extrinsic evidence. *See Cyprus Amax Minerals Co.,* 74 P.3d at 301-02. If the Court finds that the contract is not ambiguous, "then the Court enforces it according to its plain language." *Lloyd's*, 2007 WL 2694854, at *3 (citing *Mapes v. City Council of City of Walsenburg,* 151 P.3d 574 (Colo. App. 2006)). "The Court gives each word in the contract a plain and ordinary meaning, unless the contract evidences otherwise. . . . and reads the contract as a whole and does not read its provisions in isolation." *Id.* (citing *Cyprus Amax Minerals Co.*, 74 P.3d at 299).

Here, the MS Policy provided that "[a]ny coverage provided by the [MS Policy] to an additional insured shall be excess over any other valid and collectible insurance available to the additional insured whether primary, excess, contingent or on any other basis *unless*

*a written contract, agreement or permit specifically requires that this insurance apply on a primary or contributory basis.*" *MS Policy* [#83-1] at 11 (endorsement titled: Additional Insureds Exception to Excess Coverage which "modifies insurance provided under the" MS Policy) (emphasis added). The San Juan Subcontract Agreement is a "written contract" which required San Juan "to carry comprehensive liability property damage Insurance . . . and name [Okland] as an additional Insured on all insurance certificates . . . in order to protect [Okland] and [San Juan] against loss resulting from any acts of [San Juan], [its] agents, and/or employees." *San Juan Subcontract Agreement* [#70-4] at 8. The San Juan Subcontract Agreement then lists types of insurance and the associated forms which San Juan was required to obtain and execute. *Id.* This included: "Commercial General Liability Insurance . . . with . . . Endorsements attached thereto including the following or their equivalent . . . ISO Form CG 20 10 (11/85), Additional Insured - Owners, Lessees, Or Contractors (Form B), <u>naming the General Contractor and Owner as additional Insured</u> and containing the following statement - "*This Endorsement Also Constitutes Primary Coverage* and not contributing In The Event Of Any Occurrence, Claim, Or Suit". *Id.* (first emphasis and capitalization in original). While the MS Policy does not include the exact language stated in the San Juan Subcontract Agreement, it does include "equivalent" language as allowed in the agreement. As noted above, the San Juan Subcontract Agreement specified that a written agreement requiring that the MS Policy provide primary coverage would be binding on Defendant MS to provide primary coverage of an additional insured. This reading of the plain language of the MS Policy results in a finding that the MS Policy provided primary coverage to Okland.

The San Juan Subcontract Agreement also states: "[a]ll insurance required

hereunder shall be maintained in full force and effect in a company or companies satisfactory to [Okland], [and] shall be maintained at [San Juan's] expense until performance in full hereof . . ." *Id.* This language relates to the period for which San Juan must maintain insurance coverage regarding the Project.  The phrase "until performance in full hereof" is ambiguous, in that it could mean, for example, "until San Juan says it has performed its contractual obligations," or "until Okland says San Juan has performed its contractual obligations," or "until there is no dispute about whether San Juan has performed its contractual obligations."  Because the phrase is ambiguous, extrinsic evidence may be used to guide the Court in interpreting it.  *Lloyd's*, 2007 WL 2694854, at *3 (If the Court finds that an insurance policy is ambiguous, "then the Court must determine what the parties to the contract intended.  Whenever possible, such intent is discerned from the policy itself.") (citing *Bengtson*, 3 P.3d at 1235); *see also Cyprus Amax Minerals Co.*, 74 P.3d at 301-02 (as part of its analysis of what the parties to the contract intended, the Court may consider extrinsic evidence).  Defendant MS has failed to offer any extrinsic evidence relating to the meaning of the phrase "until performance in full hereof."  Indeed, Defendant MS offers no evidence in favor of interpreting this language so as to limit its primary coverage of Okland as an additional insured.  The Court is mindful that Colorado insurance law requires courts to liberally construe coverage provisions in favor of the insured.  *See Fire Ins. Exchange v. Bentley*, 953 P.2d 1297, 1300 (Colo. App. 1998) (citation omitted). In short, there is no evidence establishing that San Juan "perform[ed] in full" and that, as a result, the San Juan Subcontract Agreement's requirement that Okland be an additional insured under the MS Policy was satisfied and extinguished.  Thus, the "performance in full" language does not compel the conclusion that Defendant MS's coverage was excess to

Plaintiff's coverage at the time the Underlying Action was filed.  *See Greystone I*, 2013 WL 1324600, at *3 (quoting *Cyrus Amax Minerals Co.,* 74 P.3d at 299) ("[b]ecause of the 'unique nature of insurance contracts and the relationship between the insurer and insured,' ambiguous provisions are construed against the insurer and in favor of providing coverage to the insured.").

Construing the plain language of the Travelers Policy, the Court must conclude that the Travelers Policy provides Okland excess coverage over the MS Policy.  The Travelers Policy states:

**4.     Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a.     Primary Insurance**
This insurance is primary except when **b.** below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in **c.** below.

**b.     Excess Insurance**
This insurance is excess over:

. . .

(2) *Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.*

When this insurance is excess, we will have no duty under Coverages **A** or **B** to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. . . .

*Travelers Policy* [#70-6] at 31 (emphasis added).  Because the Court finds that the plain language of the MS Policy required Defendant MS to provide primary insurance to Okland, section 4(b)(2) of the Travelers Policy dictates that the Travelers Policy provided excess insurance to Okland.

**C.      Reimbursement**

Plaintiffs further argue that because the MS Policy is primary over the Travelers Policy, Plaintiffs are "entitled to reimbursement from [Defendant MS] of amounts spent in the defense of Okland as an excess insurer." *Plaintiffs' Motion* [#69] at 7.  Like the argument discussed in Section IV.B., *supra*, Defendant MS does not address this argument in its Response to Plaintiffs' Motion.  *See generally Response to Plaintiffs' Motion* [#83]. Therefore, in their Reply, Plaintiffs argue that Defendant MS has conceded that Defendant MS "owes [Plaintiffs] full reimbursement of all costs [Plaintiffs] incurred in Okland's defense." *Plaintiffs' Reply* [#99] at 4.  A review of the MS Motion [#84] and Defendant MS's Reply in support of the MS Motion [#102] reveal that neither of those pleadings address the reimbursement issue raised by Plaintiffs.[14]  However, as discussed above, the only support Plaintiffs provide for the argument that Defendant MS has therefore conceded the issue is a case based on Judge Brimmer's Practice Standards.  Those Practice Standards are not applicable in this case.  Therefore, the Court will not assume that Defendant MS has conceded this issue.

---

[14]  The Court notes that Defendant MS does address an argument regarding allocation of damages in a pleading [#138] filed in response to a pending motion [#126] which is not addressed herein.  However, Defendant MS does not directly address Plaintiffs' argument regarding reimbursement.  Regardless, as noted above, the Court will not read into Defendant MS's pleadings relating to the Motions an argument raised in briefing filed in response to a separate motion.

28

"When one insurance policy is 'primary' and the other policy is 'excess,' the primary

insurer pays for damages up to the limits of its policy; when that policy is exhausted, the

excess insurer covers any remaining damages up to the limits of its policy." *Baker v. Allied*

*Prop. & Cas. Ins. Co.*, --- F.Supp.2d ---, 2013 WL 1397297, at *4 (D. Colo. April 5, 2013)

(quoting *Allstate Ins. Co. v. Avis Rent-A-Car Sys., Inc.*, 927 P.2d 341, 346 (Colo. 1997));

*see also D.R. Horton, Inc.-Denver v. Travelers Indem. Co. of Am.*, 2012 WL 5363370, at

*7 (D. Colo. Oct. 31, 2012) ("*D.R. Horton I*") (citing *Apodaca v. Allstate Ins. Co.*, 255 P.3d

1099, 1103 (Colo. 2011)).  When multiple insurers have the same duty to defend, such as

when there is more than one primary insurer, that duty is joint and several.  *See D.R.*

*Horton, Inc.-Denver v. Mountain States Mut. Cas. Co.*, No. 12-cv-01080-RBJ, 2013 WL

674032, at *3 ("*D.R. Horton II*").  However, a liability insurer who breaches the duty to

defend can be found liable for the entire amount of defense fees and costs expended in

defense of the insured.  *See D.R. Horton I*, 2012 WL 5363370, at *8-9 (collecting and

analyzing cases from other jurisdictions and secondary sources and stating "Colorado

courts have not affirmatively resolved the issue of whether a liability insurer's duty to defend

is a joint-and-several obligation where there are other insurers who also have a duty to

defend.  However, there is sufficient authority indicating that, if the Colorado Supreme

Court were to address the issue, it would hold that each liability insurer has a duty to

provide a complete defense, such that a liability insurer who breaches this duty can be

found liable for the entire amount of defense fees and costs.")*; see also D.R. Horton II*,

2013 WL 674032, at *3 (when multiple insurers have a duty to defend, that duty is joint and

several).  Further, pursuant to Colorado insurance law, an "excess insurer is entitled to

recover from the primary insurer the amount paid by it which, under the primary policy,

should have been paid by the primary insurer." *Unigard Mut. Ins. Co. v. Mission Ins. Co.*, 907 P.2d 94, 99 (Colo. App. 1994).

As noted above, the Court finds that Defendant MS had a duty to defend Okland as a primary insurer in the Underlying Action because there were are allegations of property damage resulting from San Juan's defective workmanship.  Further, the Court finds that Defendant MS breached its duty to defend Okland.  As a result, although the MS Policy insured San Juan's work, because Defendant MS breached its duty to defend and its coverage is primary, Defendant MS is jointly and severally liable for all defense costs of Okland, including those related to San Juan's work.  Here, other insurers are named as Defendants, and Plaintiffs' claims are alleged against all Defendants.  *See generally Amended Complaint* [#11].  The Court does not address in this Recommendation the other Defendants' alleged duties to defend Okland, nor does it address their alleged duties to indemnify Okland.  Nevertheless, the Court finds that Defendant MS is liable to Plaintiffs for the amount Plaintiffs spent in their defense of Okland in the Underlying Action *up to the limits of the MS Policy.*[15]

Defendant MS's obligation to pay damages is limited by the unambiguous language of the MS Policy.  *See Lloyd's*, 2007 WL 2694854, at *3 (If the Court finds that the contract is not ambiguous, "then the Court enforces it according to its plain language.") (citation omitted).  The MS Policy states that "the amount [Defendant MS] will pay for damages is

---

[15]  The Court notes that Defendant MS may seek contribution from other insurers if those other insurers also provided primary insurance to Okland which would cover the Underlying Action. *See D.R. Horton II*, 2013 WL 674032, at *3 ("the allocation of defense costs is a matter to be worked out among the insurers [held jointly and severally liable] and, if they cannot do so, then by a court.").

limited as described in Section III - LIMITS OF INSURANCE." *MS Policy* [#83-1] at 40. The MS Policy also states that Defendant MS's "right and duty to defend end when [Defendant MS] ha[s] used up the applicable limit of insurance in the payment of judgments or settlements." *Id.* Further, the endorsement modifying Section III specifies that the MS Policy provides coverage up to a general aggregate limit of $2,000,000 and that there is a limit of $1,000,000 for each occurrence.[16]   The parties have not provided sufficient information for the Court to determine if the defense costs and fees for which Plaintiffs seek reimbursement constitute one occurrence under the MS Policy or multiple occurrences. Accordingly, the Court does not address this question and cannot recommend entry of judgment in Plaintiffs' favor in a dollar amount.  That issue must be resolved by the parties, addressed in further dispositive motions, or at trial.

## IV.  Conclusion

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Plaintiffs' Motion [#69] be **GRANTED in part** and that the MS Motion [#84] be **DENIED**.  Summary judgment should enter in favor of Plaintiffs and against Defendant MS on all claims.  The amount of such judgment should be determined in accordance with this Order on subsequent proceedings.[17]

IT IS **ORDERED** that pursuant to Fed. R. Civ. P. 72, the parties shall have fourteen

---

[16] Again, "occurrence" is defined in the MS Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *MS Policy* [#83-1] at 54.

[17] The Court expresses no opinion regarding the impact of this Recommendation and its simultaneous Recommendation regarding Plaintiffs' Motion for Partial Summary Judgment Re: Allocation of Damages [#126] and the Trinity Defendants' Motion for Summary Judgment [#128] on the overall allocation of defense costs.  Such allocation must be made either by the parties or in future proceedings.

(14) days after service of this Recommendation to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  A party's failure to serve and file specific, written objections waives de novo review of the Recommendation by the District Judge, Fed. R. Civ. P. 72(b); *Thomas v. Arn*, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions. *Makin v. Colo. Dep't of Corr.*, 183 F.3d 1205, 1210 (10th Cir. 1999); *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996).  A party's objections to this Recommendation must be both timely and specific to preserve an issue for de novo review by the District Court or for appellate review.  *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated:  August 29, 2013

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge